AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means



**FILED**
UNITED STATES DISTRICT COURT
LAS CRUCES, NEW MEXICO

NOV - 9 2022
@12:22 P.M.
MITCHELL R. ELFERS
CLERK OF COURT

# UNITED STATES DISTRICT COURT
## for the
### District of New Mexico

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*
2454 North Main Street, Room 138, Las Cruces, New
Mexico (NM) 88001

)
)
)
)
)
)

Case No. 22MR1682

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
See attachement A

located in the _____ District of _____New Mexico_____ , there is now concealed *(identify the person or describe the property to be seized):*
See attachement B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*
- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC 841; 21 USC 846; 18 USC 1956; 18 USC 1957; 18 USC 924 | Possession with intent to distribute controlled substances; Conspiracy to distribute controlled substances, Money laundering; Monetary transactions derived from specified unlawful activities; Firearm possession in furtherance of drug trafficking |

The application is based on these facts:
See Attachment C

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Gavin Larsen, FBI Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____Telephone_____ *(specify reliable electronic means).*

Date: ____November 9, 2022____

_____
*Judge's signature*

City and state:  Las Cruces, NM

Gregory B. Wormuth, U.S. Magistrate Judge
*Printed name and title*

**ATTACHMENT A**

*Property to be searched*

The property to be searched is 2454 North Main Street, Room 138, Las Cruces, New Mexico (NM) 88001 (Subject Premises), further described as a motel room located on the northeast facing side of the complex that is the second door in from the north end of the building behind a blue in color wall that has the number 138 in black numbers placed on it. The door to room 138 is a tan in color.

The search of the above Subject Premises shall include the search of the entire residence.



GBW

## ATTACHMENT B

*Property to be seized*

All records, information, and evidence relating to violations of 21 U.S.C. § 841, 21 U.S.C. § 846, 18 U.S.C. § 1956, 18 U.S.C § 1957, and 18 U.S.C. § 924 involving Muniz, including:

1.  Controlled substances, including, but not limited to, methamphetamine, fentanyl or fentanyl-laced pills, heroin, cocaine, and marijuana.

2.  Drug paraphernalia, including but not limited to, scales, packaging materials, items for packaging and handling drugs.

3.  Large amounts of currency, financial instruments, precious metals, jewelry and other items of value and/or proceeds of drug transactions.

4.  Any and all drug customer lists, drug records, dealers lists, or any notes containing the individual names of such persons, telephone numbers, addresses of these customers or dealers, and any corresponding records of accounts receivable, money paid or received, drugs supplied or received, or cash received to pay for controlled substances or intended to pay for controlled substances.

5.  Telephone and address books or notes containing telephone numbers and addresses of co-conspirators.

6.  Telephone toll records for homes and/or businesses owned or controlled by suspected co-conspirators, or other communication devices used by them and/or their drug trafficking associates.

7.  Messages, notes, correspondence, and/or communications between drug trafficking associates.

GBW

8. Indications of ownership or control of the Subject Premises and/or other premises used in unlawful drug trafficking activity, including but not limited to, utility bills, cancelled checks, or envelopes and deeds or leases.

9. Indications of ownership or control over any vehicles located at the Subject Premises, including but not limited to, titles, registrations, gas receipts, repair bills and keys belonging to that vehicle.

10. Records, receipts, bank statements and records, money drafts, letters of credit, money orders and cashier's checks received, passbooks, bank checks, safe deposit box keys, vault keys, safes and other items evidencing the obtaining, secreting and/or concealment, and or expenditures of money.

11. Any and all financial or other instruments evidencing placement of assets in the names other than the names of the drug traffickers themselves.

12. Books, records, receipts, diaries, notes, ledgers, airline tickets, cashier's checks, money orders and other papers relating to the transportation, ordering, sale and distribution of controlled substances and the outstanding debts and collections from controlled substances that have been distributed.

13. Photographs or videos of the drug traffickers, their co-conspirators, and the property and assets purchased with drug proceeds.

14. Other financial records, which may include airline ticket receipts, credit card receipts, rental car receipts and luggage tags reflecting points of travel.

15. Firearms and ammunition, including but not limited to handguns, rifles, shotguns and automatic weapons, as well as boxes, instruction manuals and other documentation for firearms and ammunition.

2

GBW

16. Digital video surveillance systems, including the associated storage media.

17. Any and all computers, digital media, and storage media that reasonably appear that may contain some or all of the records, information, and/or evidence described in Attachment B

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer, digital media, or storage media; any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "digital media" includes personal digital assistants (PDAs), smartphones, tablets, BlackBerry devices, iPhones, iPods, iPads, digital cameras, and cellular telephones.

The term "storage media" includes any physical object upon which electronic data can be recorded, such as hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media or digital medium.

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, smartphones, tablets, server computers, and network hardware.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff,

3

GBW

and  technical experts. Pursuant to this warrant, the FBI shall deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

4

GBW

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF:<br>2454 NORTH MAIN STREET, ROOM 138,<br>LAS CRUCES, NEW MEXICO (NM) 88001 | Case No. 22MR1682 |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Federal Bureau of Investigation (FBI) Special Agent Gavin Larsen, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises known as 2454 North Main Street, room 138, Las Cruces, New Mexico (NM) 88001 (the "Subject Premises") further described Attachment A, for the things described in Attachment B.

2.      I am a Special Agent with the FBI and have been so since July 2018.  As such, I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.  During my career as a Special Agent, I have conducted numerous criminal investigations concerning violations of the Controlled Substances Act and Firearms Act and have received ongoing training in conducting such investigations.  My experience as a special agent includes, but is not limited to: coordinating controlled purchases with undercover law enforcement officers and confidential informants, coordinating the execution of search and arrest warrant pertaining to individuals involved in the distribution of illegal drugs, assisting with court-ordered interceptions of wire and electronic communications occurring over telephones and social media utilized by members

of drug trafficking organizations (DTOs), and spoken with informants and subjects, as well as other local and federal law enforcement officers, regarding the manner in which drug traffickers obtain, finance, manufacture, store, and distribute their illegal drugs.

3.     I have been involved in an ongoing investigation regarding the distribution of controlled substances, specifically fentanyl, methamphetamine, and others not known by Jevshua MUNIZ. Since the investigation's inception, I, as well as other Special Agents and Task Force Officers with the Las Cruces/Dona Ana Metro Narcotics (Metro Narcotics), and law enforcement officials from other agencies have obtained information regarding the illegal drug trafficking activities and firearms violations of MUNIZ and others DTO members.

4.     I make this affidavit based upon my own personal knowledge, which is substantially derived from my participation in the investigation, as well as that of fellow agents and officers who have participated in the investigation.  In addition, I have developed information I believe to be reliable from additional sources including:

      a.     Information provided by Task Force Officers ("TFO"), Special Agents ("SA"), and Intelligence Research Specialists (IRS), and other law enforcement officials ("agents"), including oral and written reports that I have received directly or indirectly from said investigators;

      b.     Results of physical surveillance conducted by agents during the investigation;

      c.     A review of telephone toll records and subscriber information;

    d.    Information derived from consensually monitored conversations;

    e.    Information derived from lawfully intercepted telephone conversations and text messages;

    f.    A review of driver's license and automobile registration records;

    g.    Records from commercial databases; and

    h.    Records from the National Crime Information Center ("NCIC").

5.    This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## FEDERAL CHARGES RELEVANT TO THIS INVESTIGATION

6.    I believe there is probable cause that the MUNIZ has committed, and is committing, and will continue to commit offenses (the "Target Offenses") in violation of the following federal criminal statutes:

    a.    21 U.S.C. § 841 – Distribution and possession with intent to distribute controlled substances;

    b.    21 U.S.C. § 846 – Conspiracy to distribute controlled substances;

    c.    18 U.S.C. § 1956 – laundering of monetary instruments; and

    d.    18 U.S.C § 1957 – Engaging in monetary transactions involving property derived from specified unlawful activity.

    e.    18 U.S.C. § 924 – Possession of firearms in furtherance of drug trafficking.

## EVIDENCE SOUGHT DURING SEARCH

7.    Based on my training, experience, and participation in this and in similar

3

investigations, I know the information listed below.  I further know that drug traffickers often conceal the below described evidence of their drug trafficking in their residences and businesses, or in the residences of friends or relatives, and in surrounding areas to which they have ready access such as garages, carports and outbuildings.  They also conceal such evidence in vehicles, including vehicles outside of their residences and businesses, so that they have ready access to it and so that they can hide it from law enforcement, including law enforcement officers executing search warrants at their residences or businesses.  Evidence of the types described below is also frequently found in other areas to which a drug dealer has ready access, such as rented storage areas and safety deposit boxes, or buried underground on their property.  This evidence, which is discussed in detail in the following paragraphs, includes controlled substances, paraphernalia for weighing, packaging and distributing controlled substances, other contraband, records, documents, as well as evidence of drug transactions, proceeds from drug sales, and valuables obtained from proceeds.

a. Drug traffickers often maintain quantities of controlled substances.

b. Drug traffickers commonly maintain and use certain paraphernalia to package and prepare controlled substances for distribution.  The paraphernalia includes, but is not limited to, packaging materials (such as plastic baggies, wrapping paper, cellophane, condoms, and film canisters) and scales to weigh controlled substances.

c. Drug traffickers often maintain records of their transactions in a manner similar to the record-keeping procedures of legitimate businesses.  Even after the drugs are

4

sold, documentary records are often maintained for long periods of time, even years, to memorialize past transactions, the status of accounts receivable and accounts payable, and the names and telephone numbers of suppliers, customers and co-conspirators. These records may be maintained on paper, in the form of business and personal ledgers and diaries, calendars, memoranda, pay/owe sheets, IOUs, miscellaneous notes, money orders, customer lists, and telephone address books. These records can reflect names, addresses and/or telephone numbers of associates and co-conspirators, the sale and purchase of controlled substances including precursors, customer lists, and amounts of money owed to the trafficker by customers and by the trafficker to his/her suppliers.

d.  Drug traffickers often travel domestically and internationally to facilitate their trafficking. Evidence of foreign and domestic travel by persons engaged in illegal drug trafficking includes travel itineraries, airline tickets, receipts, passports, and visas. Many of these items are accessible via the internet and can be downloaded and saved on a computer or other digital media and on storage media.

e.  Drug traffickers often use storage facilities for drugs and other items related to trafficking that are at a location away from their residences and businesses. These off-site storage facilities are often commercial storage lockers and rooms. These locations are often used to store or hide drugs, contraband, money and other valuables. Drug traffickers often keep documents and other items tending to show the existence of other stored drugs, contraband, money and other valuables

5

in areas such as storage facilities.  Those documents and other items include rental agreements, receipts, keys, notes and maps specifically concerning off-site storage rooms, lockers, and safety deposit boxes.  This type of documentation can be stored on digital media and concealed virtually anywhere.

f.   Other evidence of transportation, ordering, possession and sale of drugs can include the following:  telephone bills to show numbers called by the drug dealers (and hence potential associates), overnight mail receipts, bank statements, deposit and withdrawal slips, savings books, investment statements, loan statements, other financial institution statements, and federal and state tax returns.  The above items are stored by drug dealers on their person or in their business, residences and surrounding garages, outbuildings, carports and yards, the residences of friends or relatives, and cars.  This type of documentation can be stored on digital media and concealed virtually anywhere.

g.   Drug traffickers usually sell their product for cash.  Because large quantities of drugs can sell for thousands of dollars at the wholesale level, dealers may have thousands of dollars in cash on hand both as proceeds of sales and to purchase supplies/inventory.  In addition, drug dealers often have other assets generated by their drug business, or purchased with cash earned, such as precious metals and stones, jewelry, real estate, vehicles, and other valuables.

h.   Drug traffickers often try to legitimize these profits from the sale of drugs.  To accomplish this goal, drug traffickers may utilize foreign and/or domestic banking

institutions and their attendant services, real estate and businesses, both real and fictitious. They also try to secret, transfer and conceal the money by (a) placing assets in names other than their own to avoid detection while maintaining control, (b) laundering money through what appears to be a legitimate business or businesses, (c) hiding the money in their homes, safes and safety deposit boxes, and/or (d) using the money to buy assets which are difficult to trace. This evidence is useful in a criminal prosecution, and it also is useful in identifying real and personal property that can be seized and forfeited by the government under existing laws. Documentation concerning this type of activity can be stored on digital media and concealed virtually anywhere.

i. Evidence of significant, unexplained income of drug dealers, or for the acquisition and concealment of money and assets of drug sales, can be found on banking and investment account statements, credit card account statements, canceled checks, money orders, deposit slips, check and savings books, business and personal ledgers, accounting records, safe deposit box records and keys, federal and state tax records, rental receipts, rental agreements, utility bills, overnight mail receipts, telephone bills, loan statements records reflecting ownership of real or personal property (such as deeds of trust or vehicle registration, insurance, and ownership information), vehicle and property rental records, lease and purchase agreements, and canceled mail. These records can be maintained on paper, but also can be maintained as electronic data on computers and other digital media. The above

items are typically kept by drug dealers on their person or in their businesses,
residences and surrounding garages, outbuildings, carports, and yards, the
residences of friends or relatives, and vehicles.

j.  The use of digital media, including smartphones, tablets, cellular phones, and
digital devices, has become part of everyday life. This is also true for drug
traffickers. Information stored in electronic form on all of the above-devices can
provide evidence of drug trafficking. Drug traffickers frequently use some or all
of these devices to communicate with co-conspirators, customers, sources of
supply, and others involved in the drug trade. These communications include, but
are not limited to, phone calls, text messages, SMS (Short Message Service)
messaging, MMS (Multimedia Messaging Service) messaging, social media posts
and messaging, and smartphone application messaging services. Smartphones,
tablets, cellular phones, and digital devices are frequently capable of storing
messages, emails, social media communications, and communications made over
smartphone applications. The content of these communications will often provide
evidence of drug trafficking. Numbers stored on a telephone (such as Caller ID
lists reflecting recently received calls, speed dial lists of names and/or telephone
numbers, and logs of outgoing and incoming calls) can provide evidence of who
the drug dealer is calling, and thus the identity of potential associates.

k.  Drug traffickers often take, or cause to be taken, photographs and/or videos of
themselves, their associates, their property and their drugs.  They usually maintain

8

these photographs and/or videos on their person or in their businesses, residences or cars, on computers, or in the residences of friends or relatives. Smartphones, tablets, cellular phones, digital cameras, and other digital devices often have the capability to take still photos and videos and save them indefinitely on the device's storage medium. Drug traffickers frequently use these devices to take their photographs and videos.

l.   Drug traffickers often maintain firearms and ammunition on their person or in their homes, businesses or cars to protect themselves and their drugs and their drug profits. They also may maintain indicia of firearms such as receipts for firearms and ammunition, boxes for firearms and ammunition, firearms cleaning supplies, and instruction manuals and other documentation for firearms and ammunition.

m.  I know that weapons (including rifles, shotguns, and handguns) are tools of the trade for drug traffickers, who often keep firearms in close proximity to themselves, and their product and proceeds, to protect them from other drug traffickers and law enforcement.

n.   Drug traffickers often conceal evidence of drug dealing in vehicles outside of their residences for ready access and to prevent detection and seizure by officers executing search warrants at their residences. This evidence, which is discussed in detail in the preceding paragraphs, includes controlled substances, indicia such as packing documents and electronic storage devices (and their contents,)

9

evidence tending to show the distribution of drugs (such as IOUs, pay-owe sheets, ledgers, lists of names and numbers, telephone address books, etc.), digital devices such as cellular/mobile/smart telephones and tablets (and their contents), and counter-surveillance devices.

o.  Drug traffickers often utilize digital video surveillance systems. A digital video surveillance system is a surveillance system that is capable of capturing images, videos, and audio that can be compressed, stored or sent over communication networks. I know that it is common for digital surveillance systems to contain storage media that allow for 30 days or more of camera footage to be stored on the system. Digital video surveillance systems can be used for nearly any environment, including a commercial business or residence. I know that drug traffickers make use of video surveillance systems to monitor who is approaching their residence and assess whether the person presents a threat to the trafficker's drugs or drug proceeds. Drug traffickers also utilize surveillance equipment to obtain advance notice when law enforcement arrives to hide or destroy evidence of criminal activity. However, given the constant recording that occurs with a digital surveillance system, it is also common that the digital video surveillance system will also depict evidence of the residents' drug trafficking activities and conversations related to drug trafficking.

p.  Documents showing who owns, occupies, or controls the location being searched also show who is responsible for the items found on the premises, including

contraband and other evidence seized. Documents and items showing the identity

of the persons owning, residing in or controlling the area being searched include,

but are not limited to, utility and telephone bills, canceled envelopes and

correspondence, outgoing answering machine messages, tax returns, keys, deeds

and mortgage receipts. These documents may also be produced on computers,

downloaded from online accounts or scanned into digital format and stored on

computers and related digital media.

q. Narcotic traffickers often maintain firearms and ammunition to protect their

narcotics and the proceeds from their narcotics trafficking activity.

## COMPUTERS, ELECTRONIC STORAGE AND FORENSIC ANALYSIS

8.     As described above and in Attachment B, this application seeks permission to

search for evidence and records that might be found on the Subject Premises, in whatever form

they are found. Much of the evidence and records described in the paragraphs above, and in

Attachment B, can also be produced and/or stored on computers, digital media and other storage

media. For this reason, I submit that if a computer, digital medium, or storage medium is found

on the Subject Premises, there is probable cause to believe those records will be stored on that

computer or storage medium. Thus, the warrant applied for would authorize the seizure of

electronic storage media or, potentially, the copying of electronically stored information, all

under Rule 41(e)(2)(B).

9.     The term "computer" includes all types of electronic, magnetic, optical,

electrochemical, or other high speed data processing devices performing logical, arithmetic, or

11

storage functions, including desktop computers, notebook computers, mobile phones, smartphones, tablets, server computers, and network hardware. The term "digital media" includes personal digital assistants (PDAs), smartphones, tablets, BlackBerry devices, iPhones, iPods, iPads, digital cameras, and cellular telephones. The term "storage media" includes any physical object upon which electronic data can be recorded, such as hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media or digital medium.

10.    *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a.   The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or

12

months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.   Technical requirements.  Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.  Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c.   Variety of forms of electronic media.  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

11.   *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying computers and/or storage media that reasonably appear that they may contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted scans of the computer or entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

13

## PROBABLE CAUSE

12.     The United States, including the FBI, Metro Narcotics, and the DEA, is conducting a criminal investigation of Muniz and other DTO members regarding possible violations of the Target Offenses.

13.     In mid-late October of 2022, a confidential human source (CHS) contacted Muniz to arrange for the purchase of a quantity of fentanyl that, based on my training and experience and speaking with other law enforcement agents, is consistent with that possessed for the purpose of distribution. The CHS traveled to meet with Muniz at a location in Dona Ana County, New Mexico and exchanged official government funds for fentanyl. Agents observed Muniz during the transaction meeting with the CHS. The following controlled buy protocols were followed by agents for the transaction:  1) agents met with the CHS and searched the CHS and the CHS's vehicle for contraband prior to the controlled purchase, 2) the CHS was provided with official government funds for the controlled buy, 3) agents followed the CHS to and from the deal location 4) agents conducted surveillance on the CHS and the deal location during the buy, 5) after the buy, agents met with the CHS at a predetermined location and collected the evidence, 6) after the buy, the CHS and the CHS's vehicle were searched and agents debriefed the CHS. No contraband was found on the CHS or in the CHS's vehicle during the pre- and post-buy searches.

14.     In early November of 2022, the CHS contacted Muniz to arrange for the purchase of a quantity of fentanyl that again, based on my training and experience and speaking with other law enforcement agents, is consistent with that possessed for the purpose of distribution. The

14

CHS traveled to meet with Muniz at the Subject Premises, entered room 138, and conducted the transaction, exchanging official government funds for fentanyl. During the buy, agents listened to the deal through electronic transmission. The following controlled buy protocols were followed by agents for the transaction:  1) agents met with the CHS and searched the CHS and the CHS's vehicle for contraband prior to the controlled purchase, 2) the CHS was provided with official government funds for the controlled buy, 3) agents followed the CHS to and from the deal location 4) agents conducted surveillance on the CHS and the deal location during the buy, 5) after the buy, agents met with the CHS at a predetermined location and collected the evidence, 6) after the buy, the CHS and the CHS's vehicle were searched and agents debriefed the CHS. No contraband was found on the CHS or in the CHS's vehicle during the pre- and post-buy searches.

15.    In early November 2022, agents conducted surveillance of the Subject Premises and observed multiple individuals enter room 138 and leave with items to include bags that they did not enter the Subject Premises with. Through my training and experience, I know this come and go activity to be consistent with narcotics trafficking. Through surveillance, agents also observed Muniz enter a vehicle close in proximity to the Subject Premises on more than one occasion to retrieve items.

16.    Through CHS information, agents learned that Muniz has access to multiple firearms. During one of the controlled purchases conducted between Muniz and the CHS, agents learned through electronic surveillance that Muniz showed the CHS a firearm.

15

17.     The CHS has consistently been corroborated through, but not limited to, other confidential source reporting, physical surveillance, and controlled buy operations.  During all controlled buy operations, physical surveillance, and electronic monitoring when physical surveillance was not possible was conducted of the CHS by agents and no lapse in time occurred. To agents' knowledge, no information provided by CHS during the time operated by current agents has been shown to be false. The CHS has charges to include, but not limited to, multiple arrest for possession of a controlled substance and multiple arrests for trafficking a controlled substance. The CHS is cooperating for possible consideration on potential charges and monetary compensation.

## **CONCLUSION**

18.     I submit that this affidavit supports probable cause for a warrant to search the Subject Premises described in Attachment A and seize the items described in Attachment B.

Respectfully Submitted,
Gavin Larsen
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to Electronically signed and telephonically
sworn on November 9 , 2022.

Gregory B. Wormuth
CHIEF UNITED STATES MAGISTRATE JUDGE

16